BARNES, J., for the Court:
¶ 1. In the early morning hours of October 20, 2007, Earnest Booth died from a gunshot wound that he suffered during an altercation at a local dance club in Benoit, Mississippi. Anthony Lafayette was charged with Booth’s murder and was convicted of manslaughter by a Bolivar County Circuit Court jury. The circuit court sentenced Lafayette to eighteen years in the custody of the Mississippi Department of Corrections (MDOC). After the circuit court denied Lafayette’s motion for a judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial, he appealed his conviction. Finding no reversible error, we affirm the circuit court’s judgment.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. Shortly after 1:00 a.m. on October 20, 2007, Lafayette was at Club Checkers in Benoit, Mississippi, mingling with some friends. Lafayette was standing on the crowded dance floor of the club when he and another man bumped into one another. Some heated words were exchanged, and Booth, who apparently was acquainted with the other man, became involved in the altercation. According to Lafayette and his brother who was with him, Booth pulled his shirt up, revealing a handgun in his waistband.[1] Feeling threatened, Lafayette produced a .9-millimeter Highpoint semi-automatic handgun and shot into the air twice. Patrons of the club immediately scattered and headed toward the exit. Timothy Mayes, the club’s security guard, was working at the front door when he *1249 heard the two shots from the back of the club. Since the club was extremely busy, it took Mayes a minute or so to maneuver through the crowd and reach the dance floor located at the back of the club. Mayes observed Lafayette and Booth standing on the dance floor and Lafayette holding a .9-millimeter handgun. Mayes, along with the club bartender, Ronald Christian, talked to Lafayette and tried to get him to leave the club peacefully. When Mayes and Christian turned back toward the front door to escort Lafayette outside, both men heard a single shot. Upon turning, they saw Booth lying on the floor, with a gunshot wound to the face. Lafayette quickly exited the club, leaving his gun. Mayes retrieved Lafayette’s .9-millimeter Highpoint handgun and a .40-caliber pistol that apparently fell from Booth’s pocket or waistband.
¶ 3. After receiving a call regarding the shooting, Officer Charles Gilmer of the Bolivar County Sheriffs Department arrived at the club and found that two Benoit police officers had already secured the scene. Officer Gilmer saw Booth lying on the dance floor, dead from a gunshot to the face. Officer Gilmer noted that the club was in disarray with tables turned over and several unspent rounds of ammunition and a shell casing lying on the floor. All of the ammunition retrieved from the crime scene was for a .9-millimeter handgun. Both guns that Mayes retrieved were turned over to the police. Later evidence showed that Lafayette had bought his .9-millimeter Highpoint handgun from a local pawn shop, along with two rounds of ammunition. Additionally, a .9-millimeter Ruger handgun was also found by Officer Gilmer on a sitting rail outside the club.
¶ 4. Although Lafayette had gone home immediately after the shooting, he contacted the police later that morning and stated that he wanted to surrender to authorities. After being read his rights and submitting a statement, Lafayette was arrested. On March 3, 2008, Lafayette was indicted for depraved-heart murder by a Bolivar County grand jury. After a jury trial, Lafayette was convicted of the lesser offense of manslaughter on October 28, 2009. At a hearing on December 17, 2009, Lafayette was sentenced to eighteen years in the custody of the MDOC. Lafayette filed a motion for a JNOV or, in the alternative, for a new trial. The circuit court denied the motion, and Lafayette timely filed his notice of appeal. Finding that Lafayette’s assignments of error are without merit, we affirm the judgment of the circuit court.
DISCUSSION
I. Whether the circuit court erred by refusing Lafayette’s peremptory jury instruction in part or in whole.
¶ 5. At the close of the trial, defense counsel renewed its motion for a directed verdict and filed a peremptory instruction, both of which the circuit court denied. Lafayette now argues that the circuit court should have granted his peremptory instruction as the State failed to prove the necessary elements of murder. In the alternative, Lafayette claims that the judge should have reduced the charge against Lafayette to manslaughter as the evidence did not support a verdict of murder.
¶ 6. “The standard of review of the denial of a request for a peremptory jury instruction is the same as that for the denial of a motion for a directed verdict.” McMillan v. State, 6 So.3d 444, 447 (¶ 12) (Miss.Ct.App.2009) (citing Baker v. State, *1250 802 So.2d 77, 81 (¶ 13) (Miss.2001)). If the evidence is sufficient to support the denial of the peremptory instruction when viewing all the evidence in a light more favorable to the State, the circuit court’s decision will be affirmed. Id. “Reversal can only occur when the facts point in favor of the defendant such that reasonable men could not have found, beyond a reasonable doubt, the defendant was guilty.” Sneed v. State, 31 So.3d 33, 40 (¶ 20) (Miss.Ct. App.2009) (citing Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005)).
¶ 7. We find that there was sufficient evidence to support the verdict and the denial of Lafayette’s peremptory instruction. Both Mayes and Christian testified that they saw Lafayette standing near Booth prior to the shooting and that Lafayette was holding a gun. The evidence showed that Lafayette had been engaged in a heated exchange with Booth prior to the shooting and that Lafayette’s gun matched the type of ammunition found at the crime scene and the type of ammunition that killed Booth. Further, Dr. Stephen Hayne, who performed the autopsy on Booth, noted that his examination revealed that Booth had been shot at close range. Lastly, Lafayette quickly left the scene after the shooting.
¶ 8. In the alternative, Lafayette also claims that the circuit court should have reduced the charge against him from murder to manslaughter. He cites the court’s sua sponte decision to include an instruction for the lesser charge as evidence that the judge “believe[d] the alleged crime was manslaughter.” The supreme court has stated: “Whether a homicide is classified as a murder or manslaughter is ordinarily an inquiry to be made by the jury.” Moore v. State, 52 So.3d 339, 347 (¶32) (Miss.2010) (quoting Hodge v. State, 823 So.2d 1162, 1166 (¶ 16) (Miss.2002)). The jury was given instructions for both murder and manslaughter and determined that Lafayette was guilty of manslaughter, not murder.
¶ 9. Based on the evidence, we find that a rational trier of fact could find the elements of manslaughter existed beyond a reasonable doubt. As the evidence was sufficient to support the verdict, we find no error in the circuit court’s denial of Lafayette’s peremptory instruction. This issue is without merit.
II. Whether the circuit court erred in denying jury instructions D-4 and D-7.
¶ 10. Lafayette contends that it was error for the circuit court to deny jury instructions D-4 and D-7. “In reviewing the grant or denial of jury instructions, this Court considers the instructions as a whole and within context.” Ruffin v. State, 992 So.2d 1165, 1176 (¶ 33) (Miss. 2008) (citing Strickland v. State, 980 So.2d 908, 922 (¶ 24) (Miss.2008)). A court may deny a jury instruction if it “incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Id.
¶ 11. Jury instruction D-4 states:
The Court instructs the jury that under the law, the term reasonable doubt as used by the Court in these instructions to the jury as the law in the trial of criminal cases, is a sacred and substantial right of this defendant, ANTHONY LAFAYETTE, who is charged with the crime of murder. The requirement of law that the [Sjtate must prove the defendant’s guilt beyond a reasonable doubt is a right given and guaranteed *1251 unto him by the laws of the State of Mississippi and the United States of America and you as jurors are bound by that law. You are accordingly instructed that if a reasonable doubt of the guilt of the defendant arises in your mind from the evidence, or from the lack of evidence, or from an insufficiency of the evidence, or from a conflict in the evidence, or from the credibility of a material witness, then under the law, it is the sworn duty of each such member of the jury, who has such a reasonable doubt in their mind as to the guilt of the defendant, to return a verdict of Not Guilty.
The circuit judge’s denial of this jury instruction was based on his finding that the instruction attempted to define the term “reasonable doubt.” Mississippi courts have a “long-standing rule” that any attempt to define “reasonable doubt” for a jury is improper since “reasonable doubt defines itself.” Colburn v. State, 990 So.2d 206, 217 (¶ 35) (Miss.Ct.App.2008) (citing Martin v. State, 854 So.2d 1004, 1009 (¶ 12) (Miss.2008)). Moreover, in Staten v. State, 989 So.2d 938, 950 (¶ 35) (Miss.Ct. App.2008), we found that language similar to the language contained in jury instruction D^4 — “that reasonable doubt could arise from the evidence, from a lack of evidence, from a conflict in the evidence, from insufficiency of the evidence, from an application of the law to the evidence, or from the credibility of a material witness” — was found to be an improper attempt to define “reasonable doubt.” (Citing Jones v. State, 912 So.2d 501, 506-07 (¶¶ 18-19) (Miss.Ct.App.2005)). Additionally, the State’s burden of proof was covered adequately in the other instructions submitted to the jury.
¶ 12. The second jury instruction that Lafayette claims was improperly denied is jury instruction D-7, which states:
The Court instructs the jury that the defendant is not required to prove that he shot the deceased in self-defense, but the State is required to prove beyond all reasonable doubt that the defendant did not shoot the deceased in self-defense, real or apparent, and unless the State has proven beyond a reasonable doubt that the defendant did not shoot the deceased in self-defense, then you must find the defendant ANTHONY LAFAYETTE not guilty. .
The circuit court denied this jury instruction as being repetitious. Lafayette argues that the circuit judge should have granted this instruction regarding the State’s burden of proof regarding self-defense as it was not “covered fairly in the other instructions.”
¶ 13. We find no error in the court’s denial of jury instruction D-7. Jury instruction S-l, which was given to the jury at trial, states:
The Defendant, ANTHONY LAFAYETTE, has been charged by an indictment with the crime of murder.
If you believe from the evidence in this case beyond a reasonable doubt that:
1. On or about October 20, 2007, Earnest Booth was a living person, and
2. the defendant, ANTHONY LAFAYETTE, did unlawfully, wilfully and feloniously, without authority of law, kill Earnest Booth, and
3. that he did so while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless' of human life, although done without any premeditated design to effect the death of Earnest Booth, and
4. said shooting was not in necessary self-defense, *1252 then you shall find the defendant guilty of murder.
If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty of murder.
(Emphasis added). Furthermore, jury instruction S-6, the State’s instruction detailing the elements for a verdict of manslaughter, said that if the State failed to prove that the shooting of Booth was “not in necessary self-defense .... beyond a reasonable doubt,” then the jury “shall find the. defendant not guilty” of manslaughter. These instructions sufficiently established the appropriate elements and burden of proof for the jury, rendering jury instruction D-7 repetitious. This issue is without merit.
III. Whether the circuit court committed reversible error by adding language to its Sharplin instruction.
¶ 14. To enable a circuit court to better address the issue of a hung jury, the Mississippi Supreme Court, in Sharp-lin v. State, 330 So.2d 591, 596 (Miss.1976), approved a specific instruction to be given to a jury to assist it with further deliberations, without prejudice to the defendant. This Sharplin instruction is to be given by the judge when he or she determines there is a likelihood that the jury may not reach a verdict. This instruction is as follows:
I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so.
Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.
iSharplin, 330 So.2d at 596.
¶ 15. Lafayette claims that the circuit judge deviated from the “precise language” of Sharplin and made improper comments prior to sending the jury back for further deliberations. In the present case, the jury returned to the courtroom after some deliberations and advised the circuit judge that it was unable to reach a unanimous verdict. The circuit judge stated:
Well, speaking to all of you, let me say that if there is any ray of hope, any slight chance of your reaching a unanimous decision, the law compels, it requires you to do so. If you are unable to succeed in doing that, that’s not the end of the day. Certainly not the end of the case. We will call back another jury that hopefully will be reasonable and fair, and one that can be successful in reaching a decision. I hope not to put the County and the State to the expense if I can get around it. But if you tell me you’re hopelessly deadlocked, I will accept your decision.
*1253 (Emphasis added). The jury then informed the circuit judge that the vote count was ten/two, although the judge instructed the jury not to disclose any further details. Several jurors expressed that a unanimous decision might not be possible. The circuit judge then had the following bench discussion with the State and defense counsel:
BY THE COURT: Okay. Do you want them to continue or not?
BY [DEFENSE COUNSEL]: I’m not sure.
BY [STATE]: It’s up to you. It’s just either side, they said ten and two one way or the other, and two of them said they can reach a decision.
BY THE COURT: And in thinking about this, some of them may join in.
BY [STATE]: Your Honor, I don’t know necessarily that they would. They can talk about it a little bit longer.
After this discourse, the circuit judge gave the jury the Sharplin instruction as follows:
The Court realizes that it is possible for honest men and women to have honest different opinions about the facts of a case. But if it is at all possible to reconcile your differences of opinion and decide the case, then you should do so. Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent considered judgment of each juror.
It is your duty as jurors to consult with one another and to deliberate in view of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.
In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you think, if you’re convinced it is erroneous. Meaning, if you think it is wrong. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the sole purpose of returning a verdict.
You are hereby instructed to please continue with your deliberations. I don’t know of anything else to say to you because I don’t know how you’re divided. I don’t know what the problematic point is. But, in addition, if you’re looking at all of the instructions as a whole, if you’re uncertain about any particular thing, you can always fall back on that part of your instructions that say, use your good common sense and your sound honest judgment.
The jury then returned for further deliberations. It was not until after the jury had left the courtroom to deliberate that counsel for Lafayette made a motion for a mistrial. The circuit court agreed with defense counsel that the jury appeared deadlocked, but the judge stated that it was standard practice to send a jury back at least once. The circuit judge further stated that if the jury returned a second time without a unanimous decision, he would grant a mistrial. After a short recess, the circuit judge had the bailiff knock on the door of the jury room and ask if the jury was making any progress toward a unanimous decision. The jury responded affirmatively, and a short time later, the jury returned with a unanimous verdict, finding Lafayette guilty of manslaughter.
¶ 16. We agree with Lafayette that the circuit court’s comments, which can be interpreted as implying that the *1254 jury was not being “reasonable and fair” and that failure to reach a decision would “put the County and the State to ... expense,” were not appropriate. However, although defense counsel made a motion for a mistrial after the jury had left the courtroom “based on what happened and the, the fact that the jurors indicated they’re hopelessly deadlocked,” Lafayette failed to object contemporaneously to the comments. Furthermore, this issue was not brought in Lafayette’s motion for a JNOV or for a new trial. Therefore, this issue is waived on appeal. See Williams v. State, 40 So.3d 630, 636 (Miss.Ct.App.2010) (defendant’s failure “to contemporaneously object” to comments made by the circuit court prior to giving a Sharplin instruction “waived th[e] issue for purposes of appellate review”) (citing Ahmad v. State, 603 So.2d 843, 846-47 (Miss.1992)). Notwithstanding the procedural bar, we find that the circuit judge’s comments, in this instance, combined with the Sharplin instruction, which was subsequently given, do not constitute reversible error.
¶ 17. The Mississippi Supreme Court has “repeatedly reversed where our circuit courts have practiced verdict coercion in excess of that allowed in Sharplin.” Folk v. State, 576 So.2d 1243, 1251 (Miss.1991). In Folk, the jury was unable to reach a verdict as one juror stated that she could not vote “not guilty” based upon her religious views. Rather than giving a Sharp-lin instruction, the judge asked the juror, more than once, if she could consider the views of the other jurors. She refused to change her stance, and he removed her from the jury. The supreme court held:
It is common knowledge that jurors carefully attend the trial judge’s every action. His position of authority, respect and neutrality give him peculiar power to influence. The principle is settled that he do nothing that would favor one party or the other or intimate a view how the case ought be decided. In the case at bar, the circuit judge, in the presence of the entire jury, inquired of juror Wilson whether she would consider the views of her fellow jurors but made no comparable specific inquest whether the other jurors would consider juror Wilson’s views. The judge’s conduct and remarks, as set forth in the course of proceedings noted above, almost certainly conveyed to one or more of the jurors who remained the substantial impression that the judge desired a guilty verdict. Sharplin charts a far safer course where such circumstances arise.
Folk, 576 So.2d at 1251 (citations omitted). The supreme court found that the trial judge’s conduct was error and remanded the case.
¶ 18. Further, in Brantley v. State, 610 So.2d 1139, 1141 (Miss.1992), after the jury had twice informed the court that it was deadlocked, the trial judge stated the following in pertinent part:
In the meantime, I’m going to ask you to seriously listen to and consider the views of all the other 11 jurors.... I think it’s going to take some considerable time for you to maturely and soberly review the testimony of each witness, the significance and impact of that testimony, its weight and credibility with you. And the same mental processes must be applied to each exhibit offered and received into evidence, its significance and impact on your mind on this case. So I’m going to ask you to continue your deliberations, to listen to each others views, consider all the testimony and the exhibits, and see if you can reach a unanimous agreement.
*1255 As I said yesterday, all the persons involved in presenting the case to you have worked a long, long time to get this case ready to present to a jury and so I’m going to ask for some more of your time in considering the matter and see whether you can reach a unanimous agreement.
However, the circuit court failed to give a formal Sharplin instruction, and defense counsel promptly moved for a mistrial based on the judge’s comments. The motion was denied. In determining that the trial judge’s actions were “clear error,” the supreme court quoted its previous holding in Edlin v. State, 528 So.2d 42, 44 (Miss. 1988): “The trial judge in this case departed from the unambiguous procedure outlined in Sharplin!,] and this departure constitutes reversible error.” Brantley, 610 So.2d at 1142. “We cannot conclude with confidence that the judge’s spontaneous charge did not taint the jury and indeed, under the facts of this case, such arguments seem unlikely.” Id. at 1143.
¶ 19. However, in Williams v. State, 868 So.2d 846 (Miss.Ct.App.2003), which involved similar circumstances to those in the present case, this Court stated that although the issue was waived for failure to object, the circuit court’s remarks did not constitute reversible error. After the jury in Williams reported that it was deadlocked, the circuit court made a remark regarding the amount of work that went into the trial. Id. at 352-53 (¶ 19). We stated that, while it would have been preferable for the comment not to have been made, the circuit court proceeded with a formal Sharplin instruction to the jury, and nothing indicated that the jury did not follow such instruction. “We do not think the court’s verbal remarks that preceded a correct instruction so tainted the jury in its work as to render its subsequent verdict so suspect that we ought to reverse.” Id. at 353.[2]
¶ 20. The outcome of the Sharplin cases are based on each one’s particular set of facts. In Folk and Brantley, the judges’ comments warranted reversal, especially as there was no Sharplin instruction given. Here, as in Williams, the judge made improper remarks but then gave the jury the formal Sharplin instruction. As we stated in Williams, this Court does not support or condone such extraneous remarks. However, the circuit judge did give a formal Sharplin instruction, which included an admonition not to “surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the sole purpose of returning a verdict.” We have no reason to believe that the jury did not follow the instruction. This issue lacks merit.
IV. Whether the circuit court failed to instruct the jury properly regarding prior inconsistent statements given by Mayes.
¶ 21. “Prior inconsistent, out-of-court statements made by a nonparty witness are not admissible as substantive evidence.” DeHenre v. State, 43 So.3d 407, 419 (¶ 57) (Miss.2010) (citing Moffett v. State, 456 So.2d 714, 719 (Miss.1984)). However, “[u]nsworn prior inconsistent statements of a witness may be used to impeach the witness’s credibility.” Lynch v. State, 24 So.3d 1043, 1047 (¶ 15) (Miss. Ct.App.2010) (citing M.R.E. 613(b)).
*1256 ¶ 22. At trial, the club’s security guard, Mayes, said that he did not see Lafayette shoot Booth. To impeach Mayes’s testimony, the State introduced recordings of Mayes’s prior statements to the police, which indicated that Mayes witnessed Lafayette shoot Booth. Lafayette claims on appeal that the circuit court “failed to properly explain to the jury that the tapes [of Mayes’s statements to the police] could not be used to convict the Defendant.” During deliberations, the jury asked to listen to the tapes of Mayes’s statements that had been played at trial. The circuit court instructed the jury that the tapes were used for “impeachment (contradictory) purposes only” and were not “admitted into evidence.”
¶ 23. As there was no contemporaneous objection at trial by defense counsel regarding the circuit judge’s instruction to the jury, this issue is waived on appeal. Furthermore, the supreme court has held that “it is the responsibility of defense counsel to ask for [a limiting] instruction” that certain testimony is for impeachment purposes only. Sipp v. State, 936 So.2d 326, 331 (¶ 9) (Miss.2006) (citing Brown v. State, 890 So.2d 901, 913 (¶ 36) (Miss. 2004)).
¶ 24. Notwithstanding, we find the circuit court’s admonishment to the jury to be satisfactory and clear. “Our law presumes the jury does as it is told. To presume otherwise would be to render the jury system inoperable.” Williams v. State, 684 So.2d 1179, 1209 (Miss.1996) (citations omitted). Thus, this issue is without merit.
¶ 25. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF EIGHTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.

. The testimony at trial was that Booth had a reputation for violence and was possibly a member of a local gang.

. We concluded that "[t]o the extent that the court's comments were prejudicial, the matter could easily have been corrected had the matter been called to the court’s attention in a timely way.” Id.