# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01310-COA

**DERRICK GOODE** **APPELLANT**

**v.**

**STATE OF MISSISSIPPI** **APPELLEE**

DATE OF JUDGMENT:          04/24/2013
TRIAL JUDGE:               HON. CHARLES E. WEBSTER
COURT FROM WHICH APPEALED: BOLIVAR COUNTY CIRCUIT COURT,
                           FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:    BRANDON ISAAC DORSEY
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                           BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:         BRENDA FAY MITCHELL
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED - 09/05/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. A jury convicted Derrick Goode for the murder of Timothy Devine in Bolivar County, Mississippi. The Bolivar County Circuit Court sentenced Goode to serve life imprisonment in the custody of Mississippi Department of Corrections (MDOC). Goode filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial and for reasonable bail pending appeal, which the circuit court denied. Goode appealed and raised the following issues: (1) the trial court erred by denying his motion for a directed verdict; (2) the jury's guilty verdict was against the overwhelming weight of the evidence; (3) the trial court erred by allowing certain photographs into evidence; and (4) the trial court erred by refusing

certain jury instructions proposed by the defense. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On March 8, 2007, the Bolivar County Sheriff's Department responded to a shooting that occurred in Gunnison, Mississippi, outside of Club Amnesia. When EMS and responding officers arrived at the scene, they discovered Timothy Devine's body lying on the sidewalk in a pool of blood. Devine had suffered gunshot wounds to the head, chest, and one thigh. Derrick Goode was quickly identified as the shooter by three eyewitnesses. On March 12, 2007, Goode's attorney arranged for Goode to turn himself in to law enforcement. On August 25, 2008, a Bolivar County grand jury indicted Goode for the murder of Devine. Goode's trial took place on April 9, 2013.

¶3.     At trial, Michael Gadison testified that he went to Club Amnesia with his cousins Reginald and Wykevion. Gadison testified that on the night of the incident, March 8, 2007, he was standing on the curb outside Club Amnesia when he saw a "maroon" or "maybe purple Chevy" coming down the highway really fast and then make "a California swirl." He said that "they did a swirl . . . looked like they were coming to do something" and that Goode was driving. He explained that Goode got out of the car first, and then "Main Boy" and two other guys got out of the Chevy. Gadison did not know the names of the other individuals. Gadison testified that Goode and the other two guys made their way through the crowd while he (Gadison) talked to "Main Boy" for a moment. Gadison testified that Goode went by the name "Doom."

¶4.     Gadison testified that after speaking with "Main Boy," he went over to where Goode

2

was standing. Gadison explained that Goode and Reginald were arguing and said Goode was walking around and "circled Reginald a couple of times, but Reginald was turning his back because he was kind of scared." He said that Wykevion "Key Key" Fortney[1] walked up, and Goode "jumped from Reginald to [Wykevion] and said[,] 'Yeah, that's my Chevy right there. I've got a brand new radio in that. Go ahead and steal that.'" Gadison said that Goode was cussing and "circling [Reginald and] kept pulling on the gun." Gadison explained that Goode was wearing a white shirt with brown khaki pants and that he (Gadison) "could see the gun" and "handle" through Goode's shirt. He testified that Goode "kept clutching it [w]hile he walked around him, he kept clutching it. He kept gripping it . . . like he was gonna pull it. He did it about 15, 20 times[.]"

¶5.    Gadison explained that when the victim Timothy "T" Devine[2] walked up and saw Goode arguing with his nephew Wykevion, Devine said, "Man, that's my nephew you're arguing with. This is Gunnison. You can't come down here and be doing people like this." Gadison testified that Goode then walked over and started arguing with Devine. Gadison explained, "[T]hey both were facing me. I'm on the wall . . . . I know this guy's got a gun[, and] . . . I didn't come down here for that," so he left the wall and told Wykevion to open the bar. Gadison said he went inside the club to get a beer. He said he "stayed there about two minutes," and when he came back out he saw Goode at the door. Gadison testified that he

---

[1] Wykevion Fortney was referred to as "Key Key" throughout the trial, but for the purpose of the opinion, we will refer to him as Wykevion.

[2] Timothy Devine was referred to as "T" Devine throughout the trial, but for the purpose of this opinion, we will refer to him as Devine.

was "face-to-face" with Goode, and "he had a strange look in his eyes." Gadison said he was nervous because "God told [him] to tell [Goode] what he brought [him] through." Gadison explained, "I said, 'Hey, [Goode], what you're about to do is you're about to do black on black crime. One of y'all is gonna be in prison and the other one's gonna be dead.' . . . He looked at me. He listened" but went back through the crowd and started arguing with Devine again. Gadison said Goode was "steady clutching . . . still clutching, like he was gonna pull - - like he was gonna pull it." Gadison said he was "20 feet away . . . over by the post office," and Reginald and Wykevion were getting ready to leave when Goode and Devine started back arguing again.

¶6.     Gadison testified that he asked another person with Goode, "What's wrong with your boy?" before the shooting occurred. He testified,

> [B]y the time I could say that and he was walking toward me . . . I looked back, [Devine,] he spit . . . he went to do . . . a little side spit . . . . When he turned his back on Goode - - like they were face-to-face because he kept like he was fixing to pull it. He must have clutched it 15 or 20 times . . . when Devine went to spit . . . he spit and before he could come back around . . . 'boom,' hit him, shot him . . . he hit him one time beside the head. "Boom," the first shot.

Gadison was "standing right there . . . 20 feet [away]" and "took off running" when he witnessed Goode shoot Devine in the head. Gadison stated that he "ran down the hill like 20–30 feet" and "ran back" to check on Devine after Goode "jumped in the car and peeled off[.]" By the time Gadison reached Devine, "he was already dead. [Devine] was dead on the first shot."

¶7.     Gadison also testified that Devine was wearing a cap and holding a "blunt in his hand"

4

when he turned his head to spit, and Devine did not have a gun. Gadison said, "[T]hat first shot really killed him[, but Goode] kept riding him, though." Gadison heard "two, [maybe] three shots" after he saw the first shot that hit Devine in the head, and "they all went in him." During cross-examination, Gadison was confronted with the statement he gave Detective Thompson on the night of the incident. Gadison's first statement did not mention seeing "Main Boy," Goode "allegedly driving down the street fast," Goode "clutching" a "gun 15 to 20 times," or Gadison seeing Goode shoot Devine. Gadison testified that he gave a second statement in July 2008 and explained again to the jury the sequence of events he witnessed on the night of Devine's murder.

¶8. Keyanna Williams testified that he was hanging out with Reginald, Wykevion, and other guys on the night of the incident. Williams was sitting outside a store called "No Limit" when Goode pulled up. Williams explained that the store and club are "connected together." He said Goode drove a "like blue . . . kind of bluish - - - like purple bluish" Impala, and Goode parked his car in front of "No Limit." Devine came later with Brian Jennings and Tyrone Fortney. Williams testified that Goode came with three other guys and got out "like somebody in Gunnison supposed to [have] been robbing him." Williams said Goode accused Charles Fortney and Casey Smith but Goode was talking to a crowd, "everybody that was there." Williams testified that Goode "had a little attitude" and was "clutching" on his gun "in his waist." Williams said Goode was "making it loud . . . talking loud so everybody can hear him," and "Timothy was telling him that - - ain't nobody trying to rob you, man. Ain't nobody trying to rob you." Williams said Devine and Goode "kept

5

arguing, arguing, and arguing," and every time Devine moved, Goode would "grab his waist." Williams testified that he saw the first shot when Goode shot Devine. Williams explained that Devine turned to spit, and Goode "upped the pistol and shot him." Williams saw Goode pull the gun and "took off" when he (Williams) heard the gunshot. He also testified that he heard "at least three or four" gunshots.

¶9. During cross-examination, Williams testified that he gave two statements regarding the incident. In 2009, Williams gave his first statement to Detective Thompson, and Williams did not tell Detective Thompson that he had seen Goode clutching a gun. Williams explained that he was just providing more details than what was in his statement because "you remember a little more as you go on because it still plays in your head no matter what." His second statement was taken in 2013.

¶10. Detective Thompson also testified. He was the chief deputy of the Bolivar County Sheriff's Department and an investigator in the First Judicial District of Bolivar County at the time of Devine's murder. Detective Thompson received a call from dispatch "of a shooting on the main streets of Gunnison, across from the post office." When he arrived at the crime scene, "there was a large crowd of people . . . and a young black male - - that was known to [him] as Timothy Devine - - was laying on the sidewalk in front of one of the clubs on Main Street." Detective Thompson explained that when he arrived, EMS had been there, and Devine was deceased. Detective Thompson testified that "Derrick Goode, aka 'Doom,'" was a suspect. On March 12, 2007, Goode's attorney called to inform the authorities that "he would be bringing Mr. Goode in to turn himself in" that day.

6

¶11. Detective Thompson also testified that he took photographs S-1(A) and S-1(B) on the night of the shooting. He explained that S-1(A) showed Devine "lying on the sidewalk on his left side . . . a pool of blood around his head[, and] . . . some blood run off the sidewalk down into the curbing area[; there was] a gauze bandage placed over his right side of his head and one on the back of his head and one under the front of his - - right under his mouth." Detective Thompson said S-1(B) showed Devine with "two bullet holes": one in "his left chest area; the other in the right chest." There was also "some matter that appear[ed] to be brain fragments in the pool of blood." He said that Devine "had bandages on his head," and "it was obvious that somebody had tried to render CPR." He testified that S-1(B) showed "a cigarette that's been partially smoked still clutched between his fingers." He also testified that he recovered "one projectile . . . a bullet that came out of a gun" at the scene. He said it was recovered "immediately adjacent to the body." Detective Thompson said that a gun was never recovered.

¶12. Dr. Steven Hayne testified as an expert in the areas of "anatomic, clinical, and forensic pathology." Dr. Hayne testified that he performed Devine's autopsy and identified the S-4 series as autopsy photographs. He said, "[T]hey consist[ed] of three gunshot wounds[, and] there was a fourth injury located on the upper left back, measuring 2 inches in length, and abrasion or scraping of the skin," which could not be excluded as being a "superficial graze gunshot wound of the left upper back." He explained that there was only "one lethal injury[,] [and t]hat was a gunshot wound to the mid-lower back of the head, found at a point five and one half inches below the top of the head, consisting of a circular gunshot wound, measuring

7

approximately three-eighths of an inch in diameter." Dr. Hayne also explained the internal aspects of the gunshot wound. He said, "[A] large caliber copper jacketed bullet that was partially fragmented" was recovered from "within the brain," which was submitted to the Mississippi Crime Laboratory.[3] Dr. Hayne testified that it was his opinion that Devine died from the gunshot wound to the head and that the gun "would have been held no closer than a foot and a half to two and a half feet away from [Devine's] head when [it] was fired."

¶13. Bryant Jennings testified that he was with Devine the whole night. Jennings said they dropped off Devine's daughter in Rosedale, and then they went back to Club Amnesia. He said he saw Devine, wearing a hat and "smoking a black and mild cigar[,]" "having a conversation" with Goode. Jennings did not know what the conversation was about. Jennings saw Devine turn his head to spit and "tilt his hat," and that was when Jennings saw "the fire from the gun on the first shot." He said that Goode "pulled the gun" "from the crotch" and "started shooting." Jennings explained that Goode and Devine were in "close range" when the fire came from the gun. Jennings also testified that he saw five shots: "two in the head, two in the chest, and one in the leg."

¶14. The State rested, and Goode moved for a directed verdict "on the basis that the State ha[d] failed to meet their burden of proof beyond a reasonable doubt." The trial court denied the motion, finding that the State had "presented at least a prima facie case as concerns the allegations and charge in the indictment."

¶15. The defense's only witness was Goode. He testified that he was on his way to

---

[3] Bryon McIntire testified as an expert in firearms and identified the recovered caliber as having characteristics consistent with a .38-caliber weapon.

Memphis and "was gonna stop through [Gunnison] and talk to Charles Fortney." Goode said he heard that Charles was trying to "set him up, bring harm to [him]." Goode testified that when he arrived at Club Amnesia, he talked to Reginald and Wykevion. Goode explained that when he was talking to Wykevion, Devine "pulled up, and he got out of the car, and he started talking crazy." Goode said that Devine "was like 'Man, what you doing talking to my little nephew like that . . . he's too young . . . if you have anything to talk about, man talk to me.'" Goode told Devine he was trying "to find out why is people [sic] down here . . . wanting to put something in [his] drink and set [him] up to rob [him]." Goode said Devine started "talking sideways." Goode testified that he and Devine got into "I guess [what] you can say [] was an argument" but did not push each other. Goode further stated that he did not own a gun, or have one on him, at the time of Devine's murder. He also testified that he went to Club Amnesia alone, and when he heard the shots fired, he took off running like everybody else. According to Goode, approximately thirty minutes later, he received a phone call while he was driving to Memphis and learned he was an "alleged suspect." He said the "person on the line" told him that "everybody's saying that you did it." Goode found out the police were looking for him when he was in Memphis, so he called Melvin, a bail bondsman. He said Melvin gave him a number for a lawyer, and he was advised to turn himself in.

¶16.    Following the jury instructions and closing arguments, the jury convicted Goode of murder. On April 10, 2013, the trial court entered an order sentencing Goode to serve life imprisonment in the custody of the MDOC. On April 17, 2013, Goode filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial and for bail pending

9

appeal, asserting "the verdict was contrary to the law and the credible evidence[,] and the evidence presented by the State [of] Mississippi was insufficient as a matter of law to support a guilty verdict of murder." On May 10, 2013, the trial court denied the motion, "find[ing] no merit on either of the grounds asserted by the defendant."

¶17. From that judgment, Goode appeals.[4] In this appeal, Goode claims the trial court erred by denying his motion for a directed verdict because "the State failed to present a prima facie case during their case in chief." In addition, Goode argues that the jury's guilty "verdict was against the overwhelming weight of the evidence" and that the trial court committed "reversible error in allowing the State's photographs S-1(A), S-1(B), S-4(A), S-4(B), S-4(C), and S-4(D) into evidence." Lastly, Goode asserts that the trial court erred by refusing the defense's proposed jury instructions D-1, D-2, D-6, D-11, and D-12.

**ANALYSIS**

1. **Did the trial court err by allowing photographs S-1(A), S-1(B), S-4(A), S-4(B), S-4(C), and S-4(D) into evidence?**

¶18. Goode argues the trial court erred by allowing photographs S-1(A), S-1(B), S-4(A), S-4(B), S-4(C), and S-4(D) into evidence because the photographs were "more prejudicial

---

[4] Goode timely filed his notice of appeal on May 23, 2013. However, the appeal was stagnant from 2013 until November 21, 2019. On that date, the Bolivar County Circuit Clerk's office sent our Clerk of Appellate Courts a letter apologizing for the delay in preparing the record on appeal. The record on appeal was ultimately filed with this Court. The parties timely submitted briefs on the issues addressed in this opinion. The State comments in its brief that Goode was dilatory in prosecuting this appeal and argues this Court could dismiss the appeal instead of deciding it on the merits. Pursuant to Rule 2(c) of the Mississippi Rules of Appellate Procedure, concerning any allegations of Goode not prosecuting this appeal and being dilatory, this Court suspends the Rules and allows this appeal to proceed on the merits.

than probative" and "were solely meant for the purpose of inflaming the jury."

¶19. "[W]e review the decision to admit or exclude evidence under an abuse of discretion standard." *Moberg v. State*, 303 So. 3d 815, 820 (¶17) (Miss. Ct. App. 2020) (quoting *Bonds v. State*, 138 So. 3d 914, 917 (¶5) (Miss. 2014)). A trial court judge has nearly "unlimited" discretion when determining if photographs can be admitted into evidence, "regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Dampier v. State*, 973 So. 2d 221, 230 (¶25) (Miss. 2008)).

¶20. Moreover, Rule 403 of the Mississippi Rules of Evidence "is an ultimate filter through which all otherwise admissible evidence must pass." *Ambrose v. State*, 254 So. 3d 77, 138 (¶203) (Miss. 2018) (internal quotation marks omitted) (quoting *Batiste v. State*, 121 So. 3d 808, 863 (¶143) (Miss. 2013)). The rule reads:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

MRE 403. "Where a trial [judge] determines that potentially prejudicial evidence possesses sufficient probative value, it is within that [judge's] sound discretion whether or not to admit same, since M.R.E. 403 does not mandate exclusion but rather provides that the evidence may be excluded." *Jones v. State*, 904 So. 2d 149, 152 (¶7) (Miss. 2005) (citing *Baldwin v. State*, 784 So. 2d 148, 156 (¶27) (Miss. 2001)).

¶21. "Even if the photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a **meaningful**

11

**evidentiary purpose**." *McLaughlin v. State*, 338 So. 3d 705, 727 (¶63) (Miss. Ct. App. 2022) (emphasis added) (quoting *Beasley v. State*, 136 So. 3d 393, 400 (¶21) (Miss. 2014)). A photograph has a meaningful evidentiary purpose if it helps describe the "circumstances of the killing, describes the location of the body and cause of death, or supplements or clarifies witness testimony." *Beasley*, 136 So. 3d at 400 (¶24).

¶22. On the second day of trial before the jury was in the courtroom, the State sought to pre-mark and introduce some exhibits. Photographs S-1(A) and S-1(B) depicted the victim on the ground at the crime scene in the position he was found and after he was rolled over, depicting a cigarette in his right hand. As to those photographs, the following exchange occurred when the State attempted to introduce them:

| | |
|---|---|
| **THE COURT:** | Is there any objection from the Defense as to S-l(A) or any of these photographs for that matter? |
| **THE DEFENSE:** | Other than the prejudicial effect outweighs the probative value. That's my only objection. |
| **THE COURT:** | Is that an objection? |
| **THE DEFENSE:** | Yes, sir. |
| **THE COURT:** | Let me look at them. |

The State argued that the photographs rebutted the defense's anticipated self-defense argument. The trial judge ruled, "I don't find them to be particularly gruesome" or "overly prejudicial." The court accepted S-1(A) and S-1(B) into evidence.

¶23. Next, after the aforementioned photographs were discussed, the State sought to introduce S-(4)(A) through S-(4)(D). The defense objected that the photographs were prejudicial, lacked probative value, and cumulative because some of the photographs depicted the same injuries. The photographs depicted the body of the victim and the location

12

of the three bullet wounds. As to those photographs, the following exchange occurred:

**THE COURT:** All right. And the objections as to - - let's just go - - do you have an objection particularized to each of the photos or just in general?

**DEFENSE:** In general and as it relates to them being cumulative in nature, as relates to all of them listed as a composite.

**THE COURT:** Well, they each - - it appears to me they each show separate matters. There's some overlap but not significant overlap. All right. The cumulative aspect of the objection is not well taken. What's the other aspect of the objection?

**DEFENSE:** That the prejudicial effect outweighs the probative value.

**THE COURT:** Well, they do - - I mean they show probative value. They're certainly not gruesome in any - - again, in the context of a murder case, they certainly can't be described as gruesome in any way. No, I think they each have some probative value. As to that objection, I overrule that objection also.

¶24. Here, the photographs had the legitimate evidentiary purpose of showing Devine's injuries and the circumstances surrounding his murder. Medical examiner Dr. Hayne found that Devine had sustained three gunshot wounds: one to the back of the head, one to the upper chest, and one to the back of the right thigh. Further, the defense sought and received a self-defense jury instruction in this case. A photograph introduced into evidence depicting both hands of the victim at the crime scene and another photograph depicting a cigarette in the victim's right hand when he was rolled over were certainly relevant to the issue of self-defense. The trial court found the probative value of all the photographs the defense objected to was not outweighed by any prejudicial effect. Further, the trial court found that none of the photographs were overly gruesome. This Court cannot say that the trial court abused its discretion in admitting the photographs, all of which were ultimately demonstrated by the

13

witnesses to have meaningful evidentiary value. We find no error.

¶25. Even if this Court were to find the trial court erred by allowing the photographs, such an error would be harmless. "An error is considered harmless when the weight of the evidence against [the defendant was] sufficient to outweigh the harm done by allowing admission of the evidence." *Smith v. State*, 352 So. 3d 1147, 1157 (¶58) (Miss. Ct. App. 2022). A "[h]armless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Croft v. State*, 283 So. 3d 1, 11 (¶34) (Miss. 2019). This Court will not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused. *Id.* Here, there was overwhelming evidence indicating Goode was guilty of the crime charged, including three eyewitnesses identifying Goode as the shooter. We find that if any error occurred, it certainly would have been harmless.

2. **Did the trial court err by denying Goode's motion for a directed verdict?**

¶26. Goode also claims the trial court erred by denying his motion for a directed verdict and argues the evidence presented at trial was insufficient to convict him of murder.[5]

---

[5] The Court notes that in Goode's brief, he cites the standard of review for the denial of a motion for a directed verdict. However, Goode does not identify or cite any relevant authority explaining why or how the trial court erred. Further, Goode fails to articulate any testimony or evidence from the trial in support of his contention that the trial court erred. He simply states that "the evidence was not sufficient for murder." It is well-established that "[a]n appellant has a duty to support his arguments with reasons and authorities." *Hollis v. State*, 320 So. 3d 518, 521 (¶8) (Miss. 2021). Our rule of appellate procedure "does not simply require a party to mention authority; the authority must be used to develop the argument in a meaningful way." *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss.

Motions for a directed verdict challenge the sufficiency of the evidence presented at trial. *Lacey v. State*, 310 So. 3d 1206, 1214 (¶18) (Miss. Ct. App. 2020). The appellate court reviews the denial of a motion for a directed verdict de novo because it is a challenge to the legal sufficiency of the evidence. *Dampeer v. State*, 989 So. 2d 462, 464 (¶6) (Miss. Ct. App. 2008); *accord McLaughlin*, 338 So. 3d at 717 (¶33) (citing *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020)). When a challenge to the sufficiency of the evidence is being reviewed, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018)).

¶27. On appeal, "the legal sufficiency of the evidence [is] viewed in a light most favorable to the State." *Carson v. State*, 341 So. 3d 995, 999 (¶9) (Miss. Ct. App. 2022) (citing *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005)). All evidence supporting a guilty verdict is accepted as true, and the State is given the benefit of all favorable inferences that can be reasonably drawn from the evidence. *Lacey*, 310 So. 3d at 1214 (¶18); *see also Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). Under this review, this Court is not required to decide "whether we think the State proved the elements." *Carson*, 341 So. 3d at 1000 (¶9) (citing *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to

Ct. App. 2022); *see* M.R.A.P. 28(a)(7); *accord Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016). "In the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error." *Randolph v. State*, 852 So. 2d 547, 558 (¶29) (Miss. 2002). Despite the failure to comply with Rule 28(a)(7), this Court will address this issue.

find that the State proved its case." *Id.* at 999 (¶9) (quoting *Williams*, 285 So. 3d at 159 (¶11)).

¶28. In *Pace v. State*, No. 2022-KA-00046-COA, 2023 WL 1792864, at *6 (¶33) (Miss. Ct. App. Feb. 7, 2023), *cert. denied* (Miss. Aug. 24, 2023), this Court addressed an analogous issue. In that case, Pace was convicted of first-degree murder. *Id.* at *5 (¶29). Therefore, the State carried the burden of proving beyond a reasonable doubt that Pace (1) killed the victim, Marsha, (2) without the authority of law, and (3) with deliberate design to effect her death. *Id.*

¶29. On a 911 call, Pace admitted that he shot Marsha (the victim) in the head, and the State presented the recording of that call to the jury. *Id.* Pace argued that the State failed to prove he intended to kill Marsha. *Id.* On appeal, Pace argued the evidence the State presented was insufficient to support his conviction and that the verdict was against the weight of the evidence because the State failed to prove that Pace had the deliberate design to kill. *Id.* In "accept[ing] as true the evidence that support[ed] the verdict[,]" the Court listed the following evidence in its review:

> Pace pulled a loaded gun on Marsha on the night of her death and shot her above the ear. The forensic pathologist opined that when Pace shot Marsha, he was approximately two or three feet away. . . . [C]ombined with witness testimony stating that Pace told Marsha . . . that he dreamed of shooting her in the head, witness testimony that Pace . . . domestically abused Marsha, and Pace's statements that on the night in question he punched Marsha in the face.

*Id*. at (¶32) (citing *Holland v. State*, 290 So. 3d 754, 762 (¶28) (Miss. Ct. App. 2020)). From the evidence, a reasonable jury could have inferred that because of the distance between Pace and Marsha, he was no longer defending himself at the time that he pulled the trigger. *See*

16

*id.* In addition, the Court concluded that a reasonable jury "could have inferred either that Pace planned to do so ahead of time or that he made the decision moments after beating her in the face." *Id.* Therefore, the Court found the evidence was sufficient.

¶30. Likewise in *Strong v. State*, 600 So. 2d 199, 201-02 (Miss. 1992), Strong was convicted of deliberate-design (now first-degree) murder. On appeal, Strong argued the trial court erred by denying his "motion for a directed verdict at the conclusion of the State's case, asserting that the State failed to meet its burden of proof, as it had not shown evidence of intent, premeditation, or malice aforethought." *Id.* at 201. The Mississippi Supreme Court explained that "deliberate design" to cause the death of a person is an essential element of murder. *Id*. at 202. That court stated, "'deliberate' always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences[, and] '[d]esign' means to calculate, plan, contemplate." *Id.* Regarding Strong's argument, the court held the evidence presented at trial was sufficient for the jury to find deliberate design. *Id.* The supreme court explained that the evidence showed Strong obtained the murder weapon (the gun) from a friend's car,

> put two more bullets in the chamber[,] and took it with him when he talked to [the victim]. He pulled the gun on her and stood over her after she was wounded and fired three more times.

*Id.* The supreme court found that "[a]ccepting this evidence and the reasonable inferences that flow from it in favor of the prosecution, it is clearly sufficient to support a guilty verdict." *Id.*

¶31. The issue Goode raises is similar to the issues presented in *Pace* and *Strong*. Goode

17

was charged and convicted with first-degree murder. The State carried the burden of proving beyond a reasonable doubt that Goode (1) killed Devine (2) without the authority of law and (3) with deliberate design to effect his death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006). The phrases "deliberate design," "malice," and "malice aforethought" are synonymous under our jurisprudence and "[c]onnote[s] an intent to kill." *Collins v. State*, 221 So. 3d 366, 371 (¶14) (Miss. Ct. App. 2016).

¶32. "Intent is a question of fact gleaned by the jury . . . and may be prove[d] . . . by showing the acts of the person involved at the time, and the circumstances surrounding the incident." *Id.* Intent "may be formed quickly, even moments before the act and may be inferred from the use of a deadly weapon." *Id.* (internal quotation marks omitted); *accord Cooper v. State*, 230 So. 3d 1071, 1080 (¶30) (Miss. Ct. App. 2017); *Holliman v. State*, 178 So. 3d 689, 700 (¶23) (Miss. 2015).

¶33. Three eyewitnesses saw Goode shoot Devine when he turned his head away from Goode to spit. Dr. Hayne testified that Devine was shot in the back of the head. A jury could reasonably infer that Devine was turned away from Goode when he was shot. After Devine fell, Goode continued to shoot him. The testimonies of three eyewitnesses and Dr. Hayne, viewed in the light most favorable to the State, were sufficient for a rational jury to find that Goode had the deliberate design to kill Devine. There was "sufficient evidence for a rational juror to find that the State proved its case." *Carson*, 341 So. 3d 995 at 1000 (¶9) (quoting *Williams*, 285 So. 3d at 159 (¶11)).

    **3.**     **Was the jury's verdict against the overwhelming weight of the evidence?**

¶34.   Goode also argues the verdict was against the overwhelming weight of the evidence.[6]

In his brief, Goode directly quotes the following in support of this argument:

> **Q:**   Okay. Did you and Mr. Devine get into an argument?
> **A:**   Yeah, I guess you can say  it was an argument because when he was saying that, I was just telling him "Man well, I wasn't really arguing. He was really the one ramping around. I was calm until I said, "Man, I just know that nobody's not gonna, you know, rob me. I'm not gonna let nobody hurt me."
> **Q:**   Okay. All right. Did you call him any names or any words?
> **A:**   No.
> **Q:**   Did you push him?
> **A:**   No.
> **Q:**   Did he push you?
> **A:**   No.
> **Q:**   Did you all fight?
> **A:**   No.
> **Q:**   Okay. Now, in March of 2007, did you own a gun?
> **A:**   No.
> **Q:**   On March 8, 2007, did you have a gun with you while you were at Club Amnesia?
> **A:**   No.

¶35.   A challenge to the weight of the evidence "is separate and distinct from a challenge to the legal sufficiency of the evidence, in that it seeks a new trial." *Holland*, 290 So. 3d at 761 (¶24).  When reviewing a weight-of-the-evidence challenge, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to

---

[6] In his brief concerning this issue, Goode actually wrote, "[T]he verdict finding King Young Brown, Jr. guilty of forcible rape was against the overwhelming weight of the evidence." It is apparent that the brief's writer included the wrong name with the wrong charge. Despite there being no one named "King Young Brown, Jr." in this case, this Court will give the benefit of the doubt to Goode and consider this issue as though it were correctly written.

stand would sanction an unconscionable injustice." *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).  In so doing, we bear in mind that "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. Ct. App. 2022) (quoting *Williams*, 285 So. 3d at 160 (¶17)).

¶36.    Here, three eyewitnesses saw Goode shoot Devine in a deliberate manner.  Each witness testified that when Devine turned his head to spit, Goode shot him in the head.  Dr. Hayne confirmed that Devine was shot in the back of the head.  The witnesses and the detective confirmed that Devine did not have a weapon on him the night of the shooting.  In fact, a photograph shows Devine with a cigarette in his hand and not a weapon.  Further, Goode testified in his defense and said he did not have a gun on the night of the incident, did not own a gun, did not "argue" with Devine, and did not shoot Devine.  Ultimately, Goode testified that he was essentially a bystander to the whole incident.  The three eyewitnesses' testimonies and Goode's testimony presented a conflict in the evidence which was a matter for the jury to resolve.  It was in the sole province of the jury to believe Goode's version of the events surrounding the shooting and murder of Devine or to believe the testimonies of the State's witnesses and other evidence presented.  Again, "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility."  *Wayne*, 337 So. 3d at 715 (¶39).  The Mississippi Supreme Court has consistently held that "neither this Court nor the Court of Appeals sits as thirteenth juror. We do not make independent resolutions of conflicting evidence.  Nor do we reweigh the

20

evidence or make witness-credibility determinations. . . . [W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little*, 233 So. 3d at 292 (¶19) (citations omitted).

¶37. In addition, the trial court instructed the jury as follows:

> It is your duty to determine the facts and to determine them from the evidence produced in open Court. . . . As sole judges of the facts in this case, you are to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. . . . You are also permitted to draw such reasonable inferences from the evidence as seem justified in the light of your own experience.

We presume the jury did exactly what the trial court instructed them to do. They determined the facts of the case by weighing the evidence and judging the credibility of the witnesses. Substantial evidence supported the jury's factual determinations. We find that the jury's resolution of the conflicting evidence in this case does not constitute an "unconscionable injustice," and the jury's verdict was not against the overwhelming weight of the evidence. Accordingly, we find no error on this issue.

### 4. Did the trial court err by refusing the defense's proposed jury instructions?

¶38. Lastly, Goode argues that the trial court erred by denying defense jury instructions D-1, D-2, D-6, D-11, and D-12. The standard of review for a trial court's decision to give or refuse a jury instruction is abuse of discretion. *Thompson v. State*, 338 So. 3d 730, 738 (¶42) (Miss. Ct. App. 2022); *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). Further, when jury instructions are challenged on appeal, this Court

> [is] mindful that trial courts are given considerable discretion regarding the instructions form and substance. It is well settled that the standard of review

21

for the giving or refusing of jury instructions is an abuse of discretion." *Pace*, 2023 WL 1792864, at *9 (¶48) (quoting *McNeer v. State*, 307 So. 3d 508, 513 (¶12) (Miss. Ct. App. 2020)). We "consider[] all given jury instructions to determine whether, when read as a whole, they fairly announce the law of the case and create no injustice." *Thompson*, 338 So. 3d at 738 (¶42) (internal quotation marks omitted). "If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted." *Id.* (internal quotation marks omitted). "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id.*

¶39. In addition, the Mississippi Supreme Court has explained that "[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Newell*, 49 So. 3d at 74 (¶20). "When serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." *Id.* Further, "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Pulliam v. State*, 321 So. 3d 1185, 1193-94 (¶27) (Miss. Ct. App. 2020).

## D-1

¶40. Instruction D-1 was a peremptory instruction, which would have instructed the jury to find Goode not guilty. This Court has already determined that there was sufficient

evidence to find Goode guilty of murder. Therefore, the trial court properly refused Goode's jury instruction. We find no error.

**D-2**

¶41. Goode offered instruction D-2, which would have instructed the jury that "reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of the evidence; but however it arises, if it arises, it is your sworn duty to find the Defendant [']Not Guilty.[']" In refusing this instruction, the trial court relied on *Lafayette v. State*, 90 So. 3d 1246 (Miss. Ct. App. 2011), *rev'd*, 90 So. 3d 1215 (Miss. 2012). The trial court also indicated that it relied on "a number of cases prior" and found D-2 "to be an improper instruction . . . an improper comment or an attempt to define reasonable doubt." The Mississippi Supreme Court has repeatedly and consistently asserted that "[r]easonable doubt defines itself." *Lett v. State*, 902 So. 2d 630, 638 (¶27) (Miss. Ct. App. 2005) (citing *Martin v. State*, 854 So. 2d 1004, 1009 (¶12) (Miss. 2003); *Chase v. State*, 645 So. 2d 829, 851 (Miss. 1994); *Williams v. State*, 589 So. 2d 1278, 1280 (Miss. 1991)). Further, in *Berry v. State*, 859 So. 2d 399, 404 (¶17) (Miss. Ct. App. 2003), this Court stated that it was proper to refuse a jury instruction defining reasonable doubt because the instruction was "superfluous." We find no error.

**D-6**

¶42. Goode offered D-6, a lesser-included-offense instruction that defined heat-of-passion manslaughter:

> The term heat of passion is defined as a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a

23

homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

Goode argued that he had a right to the manslaughter instruction because there was testimony about an argument between him and Devine. The trial court refused the instruction because Goode's position was "that he did not do any harm to the deceased and that, in fact, it was someone else," and the court found no "basis in the evidence for giving a manslaughter instruction." Ultimately, the trial court determined that Goode "forfeited" the manslaughter instruction when he got on the stand and testified that he was not the one who shot Devine.

¶43. During trial, Goode testified that he did not have or own a gun and did not shoot Devine. When asked if he had been in an argument with Devine, Goode gave conflicting answers. Initially, Goode testified there was no argument, but just "talking," and then he stated, "I guess you can say it was an argument." Regardless of Goode's response, he denied shooting Devine; therefore, there was no evidence to support giving a manslaughter jury instruction. The court "may refuse an instruction" that "is without foundation in the evidence." *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012). The trial court properly refused instruction D-6.

**D-11 and D-12**

¶44. Goode offered two instructions on eyewitness identifications. Eyewitness-identification jury instructions are not necessary where multiple witnesses identify the suspect or when there is other corroborating evidence linking the suspect to the crime. *Victory v. State*, 83 So. 3d 370, 375 (¶23) (Miss. 2012). Three eyewitnesses identified Goode

24

as the shooter. Because multiple witnesses identified Goode as the shooter, the eyewitness-identification jury instruction was not necessary. We find no error.

## CONCLUSION

¶45. The trial court did not err by denying Goode's motion for a directed verdict, and the jury's verdict was not against the overwhelming weight of the evidence. In addition, the trial court did not abuse its discretion by allowing the photographs into evidence and refusing the jury instructions. Finding no error, we affirm.

¶46. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**